AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
6/27/25
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MR___ DEPUTY

United States of America

v.

Sabrina Marie Vasquez,

Defendant.

Case No. 2:25-MJ-03970-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 25, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Carlos Duran, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 27, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Mirelle Raza x6058

**AFFIDAVIT**

I, Carlos Duran, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against and arrest warrant for Sabrina Marie VASQUEZ ("VASQUEZ"), for a violation of Title 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

2. This affidavit is also made in support of an application for a warrant to search the following:

   a. A grey colored Apple iPhone (the "SUBJECT DEVICE"), as further described in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and databases. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described

in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since November 2020. I am currently assigned to the Los Angeles Field Division, High Intensity Drug Trafficking Area Group 51. As a SA with the DEA, I have received extensive training regarding federal law enforcement, including firearms and narcotics offenses. I have completed formal training at the DEA Training Academy in Quantico, Virginia, where I received specialized training in various surveillance and investigative techniques related to organized crime and narcotics trafficking, among other things.

6. Based on my training and experience, I am familiar with the methods of operation of drug traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

## III. SUMMARY OF PROBABLE CAUSE

7. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following:

8. In May and June 2025, DEA Agents and DEA Task Force Officers ("Agents") were investigating two separate Mexican based drug brokers and utilized the same confidential source in both investigations.

9. During an operation in May 2025, the confidential source met with VASQUEZ. During this drug deal, VASQUEZ provided approximately 10,691 fentanyl-laced pills to the confidential source in exchange for $5,000. These pills were tested by a DEA laboratory and weighed approximately 1,193 grams.

10. During an operation on June 26, 2025, the confidential source met with VASQUEZ for a second time. This drug deal was coordinated by a different drug broker than the May 2025 deal. During this drug deal, VASQUEZ provided the confidential source with approximately 10,000 pills. VASQUEZ was detained after distributing the pills.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   VASQUEZ Distributes Fentanyl Pills in May 2025**

12. This investigation was initiated based on information received from a confidential source ("CS-1"[1]). In May 2025, CS-

---

[1] CS-1 is a Mexican national, who began working for DEA in 2013 after being convicted of possession of marijuana for sale and illegal re-entry into the United States following
*(footnote cont'd on next page)*

1 was in contact with a Mexican based drug broker known as "Flavio" to negotiate a deal for 10,000 fentanyl-laced pills, costing a total of $5,000. The deal was to take place in the Los Angeles area. Flavio gave CS-1 the information for a U.S. based drug broker known as "Angel," who would help complete this deal.

13. Due to uncertainty about whether CS-1 would continue working with the DEA because of CS-1's Mexican citizenship, I asked that a different DEA confidential source ("CS-2[2]") takeover the relationship with Angel. Angel used the phone number 209-994-6038 (the "6038 Number"") to communicate with CS-1, and this number was provided to CS-2.

---

deportation or removal. CS-1 works for the DEA in exchange for financial compensation, deferred action on his/her immigration status, and for permission to enter and remain in the United States. Since 2019, CS-1 has been paid approximately $830,908 for information provided to DEA investigators. Between 2019 and 2022, CS-1 also acted as a confidential source with Homeland Security Investigations. Since 2013, CS-1 has assisted DEA in investigations resulting in the seizure of thousands of pounds of narcotics and millions of dollars. To my knowledge, CS-1 has not made any false statements to me or any other government agent. Additionally, information previously provided by CS-1 has been corroborated through the investigation.

[2] CS-2 began working with DEA in 2019. CS-2 works for the DEA in exchange for financial compensation and, since 2019, has been paid approximately $28,500 for information provided to DEA investigators. CS-2 is currently on a term of federal supervised release imposed in the Eastern District of California following a 2019 arrest and 2021 conviction for possession with intent to distribute a controlled substance. In 2014, CS-2 was convicted in a California state court of drug possession for sale and sentenced to eleven years in prison. CS-2 has also been arrested of conspiracy and child cruelty. Since 2019, CS-2 has assisted with investigations resulting in seizures of hundreds of pounds of narcotics. To my knowledge, CS-2 has not made any false statements to me or any other government agent. Additionally, information previously provided by CS-2 has been corroborated through the investigation.

14. On May 20, 2025, CS-2 called and texted the 6038 Number, in order to coordinate the purchase of 10,000 fentanyl laced pills. During the conversation, Angel told CS-2 to contact a Mexican based broker who used the phone number 526671959748 (the "9748 Number"). CS-2 told me that he/she believed that Angel and the broker using the 9748 Number were operating multiple drug stash houses in Los Angeles and were coordinating with each other to find a courier for the drug deal.

15. On May 21, 2025, phone number 310-261-8404 (the "8404 Number"), texted CS-2, stating that VASQUEZ was sending a message on behalf of "Changa," which CS-2 understood to be a nickname for Angel. Agents ran the 8404 Number through law enforcement databases and found that the number was associated with VASQUEZ.

16. VASQUEZ texted CS-2 to meet for the drug transaction, providing the address in, Anaheim, CA (the "Anaheim Address"). CS-2 and VASQUEZ coordinated to meet at 10:00 a.m. on May 22, 2025.

17. On May 22, 2025, law enforcement transported CS-2 to the Anaheim Address. At approximately 10:00 a.m., CS-2 called VASQUEZ and stated he/she was at the address. VASQUEZ stated that she would arrive in 10 minutes.

18. At approximately 10:11 a.m., VASQUEZ arrived in a gray Kia sedan (the "Kia"). Then, Agents observed VASQUEZ retrieve a bag from the rear seat of the Kia and walk to CS-2's vehicle, handing CS-2 the bag. Agents observed CS-2 hand money

to VASQUEZ, which I know to be $2,500 in cash. The remaining $2,500 balance that CS-2 owed for the drugs was paid in cash, hours after the drug transaction to another suspect, L.L..

19. I took custody of the bag that CS-2 received from VASQUEZ. That bag contained two Ziploc bags containing blue pills which I recognized as likely fentanyl pills and an object wrapped in cardboard and tape, which contained additional likely fentanyl pills.

20. I submitted those pills to the DEA Laboratory for a drug analysis. The laboratory confirmed a total of 10,691 pills, which weighed 1,193 grams. The lab confirmed that at least 70% of this sample contained fentanyl, acetaminophen, and lidocaine.

B.   **VASQUEZ Distributes Fentanyl Pills in June 2025**

21. In a separate DEA investigation CS-2 was communicating for approximately three months with a Mexican based drug broker, who utilized phone number 526675772689 (the "2689 Number"), via the WhatsApp application. According to CS-2, this broker was aiming to sell fentanyl pills.

22. On June 23, 2025, the person operating the 2689 Number told CS-2 that his stash house was full and that he had ten boxes of fentanyl pills available for .40 cents per pill. Based on my training and experience, I believe each box contains 10,000 fentanyl pills. Agents directed CS-2 to order 100,000 fentanyl pills. CS-2 told the person operating the 2689 Number to provide him/her with a drug courier's number to set up the transaction.

23. On June 24, 2025, VASQUEZ called CS-2 using the 8404 Number and coordinated to meet with CS-2 on June 25, 2025, in Torrance, CA to buy more fentanyl pills  Then, on June 25, 2025, at approximately 8:45 a.m., Agents and Torrance Police Department Officers transported CS-2 to a Lowe's Store, located at 22255 Western Ave, Torrance, CA (the "Lowe's").

24. At approximately 8:59 a.m., a DEA Task Force Officer observed VASQUEZ in the driver's seat of a white Nissan Altima, w,  (the "Altima"), parked at the 7-Eleven store near Sepulveda and Western (the "7-Eleven").

25. At approximately 9:00 a.m., CS-2 texted the location of the Lowe's store to VASQUEZ and VASQUEZ responded that she was driving a white Altima. A few minutes later, Agents observed VASQUEZ depart the 7-Eleven and drive toward the Lowe's.

26. At approximately 9:10 a.m., VASQUEZ parked near CS-2's vehicle. Agents observed CS-2 exit the car and stand near the passenger side door of the Altima.

27. Based on my conversation with CS-2 and based on body worn camera footage, VASQUEZ stayed inside the Altima. VASQUEZ offered 10,000 pills to CS-2. CS-2 called the broker utilizing the 2689 Number to inquire about the additional 90,000 pills that CS-2 had requested. CS-2 told VASQUEZ that he/she would wait at the Lowe's while VASQUEZ retrieved the additional pills. VASQUEZ stated that she had to go to work in Anaheim and would bring the additional pills a different day.

28. Agents determined VASQUEZ was going to leave the Lowe's and arrested VASQUEZ.

29. During the search of VASQUEZ, Agents located the SUBJECT DEVICE on her person, tucked inside of her shirt.

30. During the search of the Altima, Agents found a purse in the passenger seat, which contained a loaded a semi-automatic pistol, namely, a Palmetto State Armory Dagger with the serial number scratched off. The purse also contained a high-capacity magazine containing ten 9mm rounds. Officers found approximately 30,000 pills located inside the center console and trunk of the Altima, which I believe are fentanyl pills based on my training and experience.



### V. TRAINING AND EXPERIENCES ON DRUG OFFENSES

32. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

33. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

---

[3] As used herein, the term "digital device" includes SUBJECT DEVICE.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

11

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

34. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

12

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VASQUEZ's thumb and/or fingers on the device; and (2) hold the device in front of VASQUEZ's face with

13

her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

36. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

37. For all the reasons described above, I submit that there is probable cause to believe that VASQUEZ committed a violation of Title 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances). There is also probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found in a search of the SUBJECT DEVICE, as described in Attachments A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27th day of June
2025.

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

14